# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

HORSEMEN'S BENEVOLENT &
PROTECTIVE ASSOCIATION – OHIO
DIVISION, INC.,

        **Plaintiff,**

        **v.**                            **Case Number 2:25-cv-98**
                                                  **JUDGE EDMUND A. SARGUS, JR.**

HORSERACING INTEGRITY AND        **Magistrate Judge Chelsey M. Vascura**
SAFETY AUTHORITY, INC., *et al.*,

        **Defendants.**

## <u>OPINION AND ORDER</u>

This matter is before the Court on the Motion for Judgment on the Administrative Record filed by Plaintiff Horsemen's Benevolent & Protective Association – Ohio Division, Inc. ("the Association") (ECF No. 28) and the Cross Motion for Judgment on the Administrative Record filed by Defendants Horseracing Integrity and Safety Authority, Charles Scheeler, Steve Beshear, Adolpho Birch, Leonard S. Coleman, Jr., Joseph DeFrancis, Terri Mazur, Susan Stover, Bill Thomason, and D.G. Van Clief (the "HISA Defendants") (ECF No. 38). Defendants Federal Trade Commission, Andrew N. Ferguson, Alvaro Bedoya, Rebecca Kelly Slaughter, Melissa Holyoak, and Lina M. Khan (the "FTC Defendants") join the HISA Defendants' Cross Motion for Judgment on the Administrative Record. (ECF No. 40.)

The HISA Defendants responded in opposition to the Association's Motion for Judgment on the Administrative Record (ECF No. 39), which the FTC Defendants joined (ECF No. 40), and the Association replied in support (ECF No. 41). The Association responded in opposition to Defendants' Cross Motion for Judgment on the Administrative Record (ECF No. 41), and the

HISA Defendants replied in support (ECF No. 43), which the FTC Defendants joined (ECF No. 44). Both Motions for Judgment on the Administrative Record are ripe for review.

For the reasons below, the Court **DENIES IN PART** and **HOLDS IN ABEYANCE IN PART** the Association's Motion for Judgment on the Administrative Record (ECF No. 28) and **GRANTS IN PART** and **HOLDS IN ABEYANCE IN PART** the HISA Defendants' Cross Motion for Judgment on the Administrative Record (ECF No. 38).

## BACKGROUND

### I.     Factual Background

The Association is a trade association for Ohio's thoroughbred racehorse owners and trainers. (ECF No. 1, ¶ 1.) In this action, the Association challenges the fees it must pay to the Horseracing Integrity and Safety Authority pursuant to the Horseracing Integrity and Safety Act. (*Id.*)

In 2020, Congress enacted the Horseracing Integrity and Safety Act (the "Act") to establish a nationwide framework for regulating thoroughbred horseracing. 15 U.S.C. §§ 3051–60. The Act created the Horseracing Integrity and Safety Authority (the "Authority"), a "private, independent, self-regulatory, nonprofit corporation." *Id.* § 3052(a). The Act charges the Authority with "developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program for covered horses, covered persons, and covered horseraces." *Id.*

The Authority submits to the Federal Trade Commission ("FTC") proposed rules or proposed modifications to rules on a number of topics, including racetrack safety, anti-doping, and medication control. *Id.* § 3053(a). Most relevant here, the Authority may propose rules related to the formula or methodology for assessing and collecting fees used to fund the

Authority. *Id.* §§ 3052(f), 3053(a)(11). Under the Act, the FTC must approve or disapprove a proposed rule or modification, and proposals will not take effect unless approved by the FTC. *Id.* § 3053(b)(2), (c)(1). The FTC "shall approve a proposed rule or modification if the [FTC] finds that the proposed rule or modification is consistent with . . . [the Act and] . . . applicable rules approved by the [FTC]."[1] *Id.* § 3053(c)(2).

Congress gave the Authority the power to fund its own budget by assessing fees against horseracing industry participants or, if willing, the States. *Id.* § 3052(f). Each year, the Authority calculates its budget and apportions amounts owed by each State. *Id.* § 3052(f)(1)(C). The States may either collect the fees themselves from covered entities and remit the fees to the Authority, or they may allow the Authority to collect the fees directly from the relevant entities. *Id.* § 3052(f)(2), (3).

States that elect to remit fees themselves determine how the requisite amount of fees will be allocated within their State. *Id.* § 3052(f)(2). For States that do not elect to remit fees, the Authority "shall allocate equitably" the fees "among covered persons involved with covered horseraces pursuant to such rules as the Authority may promulgate." *Id.* § 3052(f)(3). "Equitably" is not specifically defined in the statute. The Act defines "covered persons" as "all trainers, owners, breeders, jockeys, racetracks, veterinarians, persons (legal and natural) licensed by a State racing commission and the agents, assigns, and employees of such persons and other horse support personnel who are engaged in the care, training, or racing of covered horses." *Id.*

---

[1] The Act has been the subject of several lawsuits since its enactment. In response to litigation over whether the Act violated the Constitution by delegating unmonitored lawmaking power to a private entity, Congress amended the Act to empower the FTC to create rules that "abrogate, add to, and modify the rules of the Authority." *Oklahoma v. United States*, 163 F.4th 294, 303 (6th Cir. 2025); 15 U.S.C. § 3053(e). The Sixth Circuit recently upheld the amended version of the Act as constitutional. *Oklahoma*, 163 F.4th at 301.

§ 3051(6). The Act defines a "covered horserace" as "any horserace involving covered horses that has a substantial relation to interstate commerce." *Id.* § 3051(5).

In January 2022, the Authority proposed the Assessment Methodology Rule. (HISA Assessment Methodology Rule, 87 Fed. Reg. 9,349, 9,350 (Feb. 18, 2022).) In States that did not elect to remit fees, the Authority allocated fees among racetracks within that State. (*Id.* at 9,352.) Racetracks could propose a further allocation among covered persons involved with covered horseraces. (*Id.* at 9,353.) If a racetrack did not do so, or if the Authority determined that a racetrack's proposal was not equitable, the Authority would determine the allocation. (*Id.*)

In February 2022, the FTC published notice of the proposed Assessment Methodology Rule and provided two weeks for comments. (*Id.* at 9,349.) In April 2022, the FTC approved the Assessment Methodology Rule in an Order addressing comments. (FTC, *Order Approving the Assessment Methodology Rule Proposed by the Horseracing Integrity and Safety Authority* (Apr. 1, 2022).) While this Rule was in place, the Authority applied a 50/50 allocation of fees between racetracks and horsemen (owners and trainers) ("50/50 Split") unless the relevant racetrack and horsemen's group agreed otherwise. (Horseracing Integrity and Safety Authority Assessment Methodology Rule Modification, 89 Fed. Reg. 84,600, 84,603 n.20 (Oct. 23, 2024).)

In September 2024, the Authority posted a new proposed modification to the Assessment Methodology Rule for public review and comment to its website. (*Id.* at 84,602.) The following month, the FTC published notice of the proposed modification and solicited comments. (*Id.* at 84,601.) The Authority's proposal included an "equitable allocation" of fees among covered persons as follows: "Racetrack: 50%; Owners: 43.50%; Trainers: 5.00%; and Jockeys: 1.50%" ("Modified Allocation"). (*Id.* at 84,603, 84,607.) The Modified Allocation applies when a particular State does not elect to remit fees itself based on its own allocation method and when a

4

particular horsemen's group and racetrack have not mutually agreed to an allocation. (*Id.* at 84,607.) The Authority explained that the Modified Allocation is a reasonable estimation of the overall percentage that owners, trainers, and jockeys receive out of purse funds (prize money). (*Id.* at 84,603 n.20.) On December 23, 2024, the FTC approved the Modified Allocation in an Order addressing comments. (FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority* (Dec. 23, 2024).)

## II.  Procedural Background

Prior to 2025, the Authority determined that the Association was responsible for 50% of Ohio's fees and Ohio's thoroughbred racetracks (Belterra Park, JACK Thistledown, and Mahoning Valley) were collectively responsible for the remaining 50%. (ECF No. 1, ¶¶ 1, 34.) For 2025, the Authority determined that the Association is responsible for paying 48.5% of Ohio's fees, with the three Ohio racetracks collectively responsible for paying 50%, and jockeys responsible for paying 1.5%. (*Id.* ¶ 34.)

In February 2025, the Association commenced this lawsuit against the HISA and FTC Defendants, alleging that Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 554, 556–57, 706(2)(A), because the 50/50 Split did not go through notice-and-comment rulemaking and the 50/50 Split and Modified Allocation are arbitrary and capricious. (ECF No. 1.) The Association asks this Court to declare the past and present fee allocations unlawful and vacate and enjoin those allocations. (*Id.*) The Association filed a Motion for Preliminary Injunction when it initiated this action (ECF Nos. 2, 3), but subsequently withdrew that Motion and jointly moved with Defendants to set a briefing schedule on the then-

forthcoming cross motions for judgment on the administrative record. (ECF No 24.) The Court granted the Parties' Joint Motion for Scheduling Order. (ECF No. 25.)

In April 2025, the FTC Defendants filed a certified copy of the administrative record. (ECF No. 27.) The Association then moved for judgment on the administrative record. (ECF No. 28.) The HISA Defendants filed a combined Cross Motion for Judgment on the Administrative Record and Response in Opposition to the Association's Motion. (ECF Nos. 38, 39.) The FTC joined the HISA Defendants' Cross Motion and Response in Opposition in full, but wrote separately to emphasize certain points. (ECF No. 40.) The Association then filed a combined Response in Opposition to Defendants' filings and Reply in Support of its own Motion. (ECF No. 41.) Finally, the HISA Defendants replied in support of their Cross Motion (ECF No. 43) and the FTC Defendants joined in full, again writing separately (ECF No. 44).

## LEGAL STANDARD

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500, *et seq.*, authorizes "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to seek judicial review of the agency action. 5 U.S.C. § 702(2)(A). The APA provides that courts should set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This determination must be made based on the administrative record. 5 U.S.C. § 706.

An agency's decision is "arbitrary and capricious" when the agency:

has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

6

*Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Review under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency. *Chamber of Com. of U.S. v. Sec. & Exch. Comm'n*, 115 F.4th 740, 750 (6th Cir. 2024) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020)). A court's task is to ensure the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Assoc.*, 463 U.S. at 43).

## ANALYSIS

### I.     Request for Oral Argument

As a preliminary matter, the Court addresses the HISA Defendants' request for oral argument. They write "Oral Argument Requested" in the captions of their briefs. (ECF No. 38, PageID 469, 471; ECF No. 43, PageID 559.) The Association opposes that request. (ECF No. 41, PageID 539.) Local Civil Rule 7.1(b)(2) provides for oral argument where it "is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." S.D. Ohio Civ. Rule 7.1(b)(2). The Court has reviewed the Parties' briefs, which address the facts and issues in this case extensively, as well as the administrative record, and finds that oral argument is not essential to the fair resolution of this case. In addition, under the Local Civil Rules, the party requesting oral argument must succinctly explain the grounds for that request, which the HISA Defendants have not done here. *Id.* The Court denies the HISA Defendants' request for oral argument. *See Whitescarver v. Sabin Robbins Paper Co.*, No. C-1-03-911, 2006 WL 2128929, at *2 (S.D. Ohio July 27, 2006) (Dlott,

7

C.J.) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

## II.     The 50/50 Split Allocation

The Association argues that the 50/50 Split failed to comply with the notice-and-comment requirements under the APA and is arbitrary and capricious. (ECF No. 28, PageID 435–39.) Defendants contend that the Association's challenge to the 50/50 Split fails due to lack of standing because any ruling by this Court will not redress the Association's claimed injury, and fails on the merits because the 50/50 Split is not final agency action that can be challenged under the APA and, even if it was, the 50/50 Split is consistent with applicable rules and regulations. (ECF No. 38, PageID 484–88; ECF No. 40, PageID 528–30.)

Some background is helpful before addressing these arguments. On June 13, 2023, the Association sent a letter to the Ohio racetracks objecting to the 50/50 Split. (ECF No. 1, ¶ 63; ECF No. 1-4.) On September 26, 2023, the Association and the Authority entered into an Escrow Agreement to escrow disputed allocations pursuant to a separate Standstill and Tolling Agreement.[2] (ECF No. 1, ¶ 67; ECF No. 3-1, PageID 287–302.) They agreed to escrow: (i) the total due for 50% of the 2023 allocation (offset by any previous payments by the Association for 2023); and (ii) 15% of the total 2024 allocation. (ECF No. 1, ¶ 67; ECF No. 3-1, PageID 287, 298.) Under the Escrow Agreement, disbursement is to occur "[a]t the time of and based upon the final disposition of *Louisiana, et. al. v. HISA, Inc., et al.*, No. 6:22-cv-01934-TAD-PJH (W.D. La. 2022), and any appeals therefrom." (ECF No. 3-1, PageID 288.)

---

[2] The Association alleges that the Standstill and Tolling Agreement has expired and that the Authority stated it does not wish to revive the arrangement. (ECF No. 1, ¶ 68.)

The case *Louisiana, et. al. v. HISA, Inc., et al.*, No. 6:22-cv-01934 (W.D. La. 2022) (the "Louisiana case") was initiated in June 2022, and in February 2023, an Amended Complaint was filed which includes the Association as a plaintiff. (*Louisiana, et al. v. HISA, Inc., et al.*, W.D. La. Case No. 6:22-cv-01934, ECF No. 76.) The Amended Complaint brings a challenge under the APA to the Assessment Methodology Rule approved by the FTC in April 2022. (*Id.* at ¶¶ 16, 275–81, 290–93.) Plaintiffs in the Louisiana case request that the Authority be enjoined from levying any assessment or collecting any fees from them under the then-current status of the Act. (*Id.* ¶ 308.)

In March 2023, the Authority moved to strike the Amended Complaint in that case, challenging the addition of the newly added parties. (*Louisiana, et al. v. HISA, Inc., et al.*, W.D. La. Case No. 6:22-cv-01934, ECF No. 92.) The Magistrate Judge issued a Report and Recommendation in September 2023, recommending that the Motion to Strike be granted and that the case be stayed pending an appeal before the Fifth Circuit Court of Appeals in *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* (Case No. 23-10520), which also involves a challenge to the Act. (*Louisiana, et al. v. HISA, Inc., et al.*, W.D. La. Case No. 6:22-cv-01934, ECF No. 99.) On September 14, 2023, the district court stayed the *Louisiana* case, including objections and responses to the Magistrate Judge's Report and Recommendation, and it remains stayed to date. (*Louisiana, et al. v. HISA, Inc., et al.*, W.D. La. Case No. 6:22-cv-01934, ECF No. 100.)

As mentioned above, pursuant to an Escrow Agreement between the Association and the Authority, the fees the Association paid under the 50/50 Split are contained in an escrow account that will be disbursed "[a]t the time of and based upon the final disposition" of the *Louisiana* case. (ECF No. 3-1, PageID 288.) In addition, the Escrow Agreement provides that if the final

disposition of the *Louisiana* case does not provide sufficient direction to the Parties, the escrow shall remain in place and "i) a court of competent jurisdiction will determine the appropriate distribution of the funds, or ii) the Parties will provide joint Written Direction . . . to the escrow agent, whichever occurs first." (*Id.*) The *Louisiana* case has not reached a final disposition.

The Association argues that the Court can assess the legality of the 50/50 Split because the Escrow Agreement does not address whether the funds should have been collected in the first place. (ECF No. 41, PageID 543–45.) Even so, the Association acknowledges that the funds it paid under the 50/50 Split are held in escrow and the Escrow Agreement determines how those funds will be allocated. (*Id.*) The Association does not dispute the validity or enforceability of the Escrow Agreement.

At this time, the Court finds that the most prudent path is to hold in abeyance the issue of whether the 50/50 Split violates the APA and stay this case pending a decision in the *Louisiana* case. Per the Escrow Agreement, the funds that the Association paid under the 50/50 Split will be disbursed based on and at the time of the *Louisiana* case's final disposition. Because the *Louisiana* case has not reached a final disposition, even if this Court were to decide the 50/50 Split issues in the Association's favor, those funds would not yet be disbursed. And, when disbursement does occur, it will depend on the disposition of the *Louisiana* case, which is unknown at this time.

The Court holds in abeyance the Association's Motion for Judgment on the Administrative Record and the HISA Defendants' Cross Motion for Judgment on the Administrative Record with respect to whether the 50/50 Split violates the APA. (ECF Nos. 28, 38.) The Court orders the Parties to file a joint notice when the *Louisiana* case concludes indicating that the *Louisiana* case has reached a final disposition and addressing the impact of

10

the final disposition on their Motions for Judgment on the Administrative Record. If the Parties cannot agree to a joint notice, they are instructed to file separate notices.

Until such time when the Parties file the aforementioned notice(s), the Court finds that a stay is warranted. A federal court's power to stay a case "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Latta v. U.S. Dep't of Educ.*, 653 F. Supp. 3d 435, 439 (S.D. Ohio 2023) (Watson, J.) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). This includes the power to *sua sponte* stay the district court proceedings. *Id.* The four factors the Court considers in assessing whether to stay a case are: (1) "the potentiality of another case having a dispositive effect on the case to be stayed," (2) "the judicial economy to be saved by waiting on a dispositive decision," (3) "the public welfare," and (4) the "hardship/prejudice to the party opposing the stay, given its duration." *Id.* (quoting *Michael v. Ghee*, 325 F. Supp. 2d 829, 831 (N.D. Ohio 2004)).

Here, all four factors weigh in favor of a stay. As to the first factor, the *Louisiana* case has the potential to be dispositive on the issue of the 50/50 Split. Under the terms of the Parties' Escrow Agreement, the final disposition of the *Louisiana* case dictates when and how funds paid under the 50/50 Split are to be disbursed. The second, third, and fourth factors also support a stay because a stay will control litigation expenses, thereby benefitting the Court, the Parties, and the public. *Rowe v. JPMorgan Chase Bank, N.A.*, No. 2:24-cv-554, 2024 WL 4328940, at *3 (S.D. Ohio Sep. 27, 2024) ("Controlling litigation expenses and conserving judicial resources 'serves not only the parties and the Court, but also the public as a whole.'"). Without a stay, this case and the *Louisiana* case could arrive at conflicting outcomes, which is likely to create more litigation over how the funds subject to the Escrow Agreement will be distributed. As such, at the

11

conclusion of this Opinion and Order, the Court stays the case until the Parties file a notice on the docket indicating that the *Louisiana* case has reached a final disposition and explaining the implications of that disposition on the instant case.

### III.     The Modified Allocation

The 50/50 Split is no longer in effect, and the Authority now collects fees from covered persons pursuant to the Modified Allocation, which allocates 50% of fees to racetracks, 43.5% to owners, 5% to trainers, and 1.5% to jockeys. (FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority*, at 2, 20 (Dec. 23, 2024).)

The Association argues that the Modified Allocation is arbitrary and capricious because (1) Defendants excluded covered persons from the allocations and provided no rationale for doing so and (2) Defendants did not provide a reasoned explanation for the covered persons they picked to assess. (ECF No. 28, PageID 436–40; ECF No. 41, PageID 549–52.) Defendants respond that they complied with the Act and the APA because the Modified Allocation is reasonable and the FTC's Order approving the Modified Allocation is reasonably explained. (ECF No. 38, PageID 488–93; ECF No. 40, PageID 530–35; ECF No. 43, PageID 568–71; ECF No. 44, PageID 578–80.)

Judicial review under the APA's arbitrary-and-capricious standard is deferential. *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*

First, the Association argues that Defendants acted arbitrarily and capriciously by excluding entire categories of covered persons from the Modified Allocation without

12

justification. (ECF No. 28, PageID 437–38.) The Association says Defendants failed to consider assessing costs to all of the statutorily defined "covered persons," and did not explain why certain participants were exempted. (*Id.*)

As the FTC's Order notes, the "Act does not mandate that the allocation be made among all Covered Persons; rather, it simply requires the allocation to be 'equitable.'" (FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority*, at 20 (Dec. 23, 2024).) Defendants provided reasonable bases for their decision not to assess fees against all categories of covered persons. First, "[e]xcluding from the calculation low-wage workers (like grooms), who may not receive a share of any winnings, is a reasonable approach and consistent with notions of fairness, the touchstone of equitability." (*Id.*) Further, "[e]xempting veterinarians is also appropriate" because, "[g]iven the current shortage of equine veterinarians, allocating fees to that group could pose a risk to racetrack safety if it disincentivizes them from continuing to treat Covered Horses." (*Id.*) Finally, "not all breeders are 'involved with covered horseraces,'" as a "breeder who is not otherwise an Owner, Trainer, or other Covered Person may have ceased his or her relationship to the horse by selling it prior to that horse becoming a Covered Horse subject to the Act[.]" (*Id.* at 20–21.)

Second, the Association argues that Defendants failed to provide a reasoned explanation for the covered persons they picked to assess and criticizes the lack of empirical data underlying the fee percentages assigned. (ECF No. 28, PageID 438; ECF No. 41, PageID 550.) But the FTC explained that it allocated fees among racetracks, owners, trainers, and jockeys because (1) the Authority represented that this allocation reflects a "reasonable estimation of the overall percentage" that "each one of those classes of covered persons receives out of purse funds;" (2) the "Authority has been in operation for over three years, and it is familiar with the roles of each

class of Covered Persons and how they are compensated;" and (3) there was an "absence of any evidence that the Authority incorrectly estimated the percentage of purses paid to each class of Covered Persons." (FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority*, at 20 (Dec. 23, 2024).)

The Association also says the Authority offered conclusory responses to comments. (ECF No. 28, PageID 440.) The FTC must give reasoned responses to significant comments, and the FTC satisfied this standard here. *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 714 (6th Cir. 2022) (quoting *United States v. Utesch*, 596 F.3d 302, 310 (6th Cir. 2010)). As support for its argument, the Association references a public comment that raised concerns about whether the Modified Allocation was equitable because it excluded various "covered persons" such as breeders, veterinarians, and other state-licensed individuals involved in the horse racing industry. (ECF No. 28, PageID 440.) The FTC's Order acknowledged that "[o]ne commenter suggested that the proposed equitable allocation . . . is not consistent with the Act because it exempts some 'Covered Persons' (such as breeders, veterinarians, and grooms) from the allocation of fees." (FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority*, at 18 (Dec. 23, 2024).) The FTC explained that "nothing in the text of the Act requires that *all* types of covered persons, regardless of circumstance, be included in the allocation" and identified specific reasons why the Authority did not impose allocations on breeders, veterinarians, and grooms, discussed *supra* (not all breeders are covered persons, veterinarians are in short supply, and low-wage workers like grooms may not receive a share of the winnings). (*Id.* at 18, 21 (emphasis in original).) The

14

FTC provided a reasoned response to criticism about the categories of covered persons excluded from the Modified Allocation.

In the context of arguing that the Modified Allocation is arbitrary and capricious, the Association suggests that the FTC exceeded its statutory authority by narrowing the definition of "covered persons." (ECF No. 28, PageID 437–38.) Under the APA, federal courts must set aside agency action that is undertaken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Courts exercise "independent judgment in deciding whether an agency has acted within its statutory authority," but may consider the agency's views. *U.S. Sportsmen's All. Found. v. Ctrs. for Disease Control & Prevention*, 167 F.4th 813, 818–19 (6th Cir. 2026) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)).

The Modified Allocation assesses fees to racetracks, owners, trainers, and jockeys, but the Act's definition of "covered persons" includes other categories of industry participants. 15 U.S.C. § 3051(6). The Act, however, does not require that fees be assessed among all covered persons; instead, the allocation must be equitable. *Id.* § 3052(f)(3). As discussed above, Defendants had sensible reasons for excluding certain covered persons from the Modified Allocation, and the fact that the Modified Allocation does not assess fees against all covered persons does not make it inequitable or mean the FTC exceeded its statutory authority. The Act also provides that the FTC "shall approve" a proposed rule if it finds the rule to be "consistent with" the Act. *Id.* § 3053(c). Here, the FTC concluded that the Modified Allocation was consistent with the Act and approved the Rule accordingly. (FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety*

*Authority*, at 24 (Dec. 23, 2024).) As such, the Court finds that Defendants did not exceed statutory authority by issuing the Modified Allocation.

In sum, the FTC "reviewed the Act's text, the Notice containing the proposed rule modification's text and the Authority's explanation, the Authority's supporting documentation, public comments, and the Authority's response to those comments." (*Id.* at 3–4.) After doing so, the FTC decided that the Modified Allocation was consistent with the Act and the FTC's rules. (*Id.* at 24.) The Court concludes that the FTC reasonably considered the relevant issues and reasonably explained the basis for the Modified Allocation. As such, the Modified Allocation was not arbitrary and capricious, and Defendants did not violate the APA.

## CONCLUSION

For the reasons above, the Court **DENIES IN PART** and **HOLDS IN ABEYANCE IN PART** (ECF No. 28) the Association's Motion for Judgment on the Administrative Record and **GRANTS IN PART** and **HOLDS IN ABEYANCE IN PART** (ECF No. 38) the HISA Defendants' Cross Motion for Judgment on the Administrative Record, which the FTC Defendants joined in full (ECF No. 40). The Clerk is **DIRECTED** to take down the gavel on those Motions (ECF Nos. 38, 40).

The Court **ORDERS** the Parties to file a joint notice upon the conclusion of the *Louisiana* case indicating that the *Louisiana* case has reached a final disposition and addressing the impact of that final disposition on their Motions for Judgment on the Administrative Record in this Court. If the Parties cannot agree to a joint notice, they are instructed to file separate notices. The Court **STAYS** this case until the Parties file the aforementioned notice(s).

**IT IS SO ORDERED.**

16

**3/23/2026**　　　　　　　　　　　　　　　　　　**s/Edmund A. Sargus, Jr.**
**DATE**　　　　　　　　　　　　　　　　　　　　　**EDMUND A. SARGUS, JR.**
　　　　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**